**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| CENTRAL AMERICAN RESOURCE CENTER<br>1460 Columbia Rd. NW, Suite C-1<br>Washington, DC 20009,<br><br>BLANCA MIRNA ROMERO DEL CID<br>c/o Democracy Forward Foundation<br>1333 H St. NW<br>Washington, DC 20005,<br><br>JOSE OSCAR VELASCO GARCIA<br>c/o Democracy Forward Foundation<br>1333 H St. NW<br>Washington, DC 20005,<br><br>VILMA HAYDEE HERNANDEZ<br>c/o Democracy Forward Foundation<br>1333 H St. NW<br>Washington, DC 20005,<br><br>HEROLDINE BAZILE,<br>c/o Democracy Forward Foundation<br>1333 H St. NW<br>Washington, DC 20005,<br><br>JUAN FRANCISCO MEDINA<br>c/o Democracy Forward Foundation<br>1333 H St. NW<br>Washington, DC 20005,<br><br>MARIA FLORISELDA ALVAREZ GOMEZ<br>c/o Democracy Forward Foundation<br>1333 H St. NW<br>Washington, DC 20005,<br><br>YOLANDA MARITZA RAMIREZ MARTINEZ<br>c/o Democracy Forward Foundation<br>1333 H St. NW<br>Washington, DC 20005, and<br><br>*Plaintiffs*, | Case No. |

v.

KENNETH T. CUCCINELLI II, in his
    official capacity as Senior Official
    Performing the Duties of the Director of
    U.S. Citizenship and Immigration
    Services,
20 Massachusetts Ave NW,
Washington, DC 20529,

U.S. CITIZENSHIP AND IMMIGRATION
    SERVICES,
20 Massachusetts Ave NW,
Washington, DC 20529,

CHAD WOLF, in his official
    capacity as Acting Secretary of
    Homeland Security,
2707 Martin Luther King Jr Ave SE,
Washington, DC 20528, and

U.S. DEPARTMENT OF HOMELAND
    SECURITY,
2707 Martin Luther King Jr Ave SE,
Washington, DC 20528,

*Defendants.*

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

# TABLE OF CONTENTS

INTRODUCTION ……………………………………………………………………...…1

JURISDICTION AND VENUE ……………………………………………………….7

PARTIES ……………………………………………………………………………7

LEGAL BACKGROUND ……………………..…………………………………………16

    I.     The Temporary Protected Status Program ………………….…………………16

    II.    Adjustment of Status …………………………………………….…………....18

    III.   Adjustment of Status for TPS Beneficiaries with Final Removal Orders ……...21

    IV.   The Rules Governing the Appointment of Constitutional Officers ………..……23

    V.    The Position of Director of USCIS ……..……………………………………26

FACTUAL ALLEGATIONS ……..……………………………………………………27

    VI.   The Trump Administration's Reliance on Acting Officials …..…………….…..27

    VII.   Mr. Cuccinelli's Unlawful Appointment ……….…..……………………………30

    VIII.  Mr. Cuccinelli's Unlawful TPS Policy Alert ……….…..……………………….38

    IX.   The Trump Administration's Animus Toward TPS Beneficiaries ………….…..42

    X.    Plaintiffs' Harms from the Unlawful TPS Policy Alert ………..………………44

CLAIMS FOR RELIEF ……………………………………………………………49

REQUEST FOR RELIEF ……………………………………………………….……55

Plaintiffs Central American Resource Center ("CARECEN"), Blanca Mirna Romero del Cid, Jose Oscar Velasco Garcia, Vilma Haydee Hernandez, Heroldine Bazile, Juan Francisco Medina, Maria Floriselda Alvarez Gomez, and Yolanda Maritza Ramirez Martinez (collectively, the "Individual Plaintiffs") hereby sue Defendants Kenneth T. Cuccinelli II, in his official capacity as Senior Official Performing the Duties of the Director of U.S. Citizenship and Immigration Services, Chad Wolf, in his official capacity as Acting Secretary of Homeland Security, U.S. Citizenship and Immigration Services, and the U.S. Department of Homeland Security, and allege as follows:

1.      Under the decades-old Temporary Protected Status ("TPS") program, immigrants from countries afflicted by armed conflict, natural disaster, or epidemic have been afforded protection from deportation. TPS provides an important source of protection and work authorization that can be renewed so long as the individual's country of origin continues to meet the humanitarian crisis conditions that led to its designation, but does not amount to a permanent immigration status. TPS is also not a status that offers, on its own, a path to lawful permanent resident ("LPR") status, regardless of how long the immigrant has had TPS.

2.      Wanting a more secure and stable life, TPS beneficiaries may (and often do) seek to adjust their status to that of LPR based on their qualifying relationship to a U.S. citizen family member, which would allow them to remain in the United States indefinitely and potentially naturalize to become a U.S. citizen.

3.      This case concerns a policy that impedes the ability of TPS beneficiaries with orders of deportation or removal to adjust their status to LPR.

4.      Adjustment of status is the process through which one applies for LPR status while remaining in the United States, instead of having to return to one's country of origin to

process at a U.S. consulate. While TPS does not itself provide a path to adjustment to LPR status, many TPS beneficiaries do have an independent legal basis for adjusting their status through their U.S. citizen relatives. Among other prerequisites, adjustment applicants must demonstrate to U.S. Citizenship and Immigration Services ("USCIS") that they (1) have been inspected and admitted or paroled into the United States, and (2) are not subject to any of the inadmissibility grounds set forth in the Immigration and Nationality Act ("INA"). *See* 8 U.S.C. § 1255(a).[1]

5. Many TPS beneficiaries initially entered the United States without inspection and for that reason are not eligible to apply to adjust their status to LPR. A substantial number also have a pre-existing deportation or removal order[2] stemming from their original entry into the United States, which separately precludes them from applying to adjust their status to LPR. For these reasons, many TPS beneficiaries find themselves stuck in legal limbo: protected against removal by TPS, but also prevented from adjusting status with USCIS because they have never been "admitted or paroled into the United States," and/or because they have a prior, unexecuted order of removal pending against them.

6. A simple procedure—based on USCIS policy and practice and in keeping with the plain text of the INA—has provided an opportunity to address these circumstances, meet the eligibility and jurisdictional requirements to apply for adjustment of status through USCIS, and escape this precarious position. The INA states that any immigrant "ordered deported or removed … ***who has left the United States***, shall be considered to have been deported or removed in

---

[1] As explained below, USCIS does not have jurisdiction over adjustment applications of individuals in removal proceedings, including those with a final order of deportation or removal that has not yet been executed by the individual's departure from the United States.

[2] For purposes of this Complaint, the terms "deportation" and "removal" are used interchangeably.

pursuance of law." 8 U.S.C. § 1101(g) (emphasis added). Thus, departing the country would serve to execute, or satisfy, the individual's outstanding removal order, which would no longer be considered pending against them when they returned. *Id.*

7.     Under this scheme, the TPS beneficiary would obtain travel authorization from USCIS to (1) depart the United States, thereby "executing" their removal order; and (2) return to the United States with prior USCIS consent provided through a grant of "advance parole"— thereby making them "inspected and admitted or paroled" for purposes of satisfying the prerequisites for adjustment under 8 U.S.C. § 1255(a). This departure and lawful return would make these TPS beneficiaries eligible to apply for adjustment of status, and confer jurisdiction upon USCIS over their subsequent applications for adjustment of status.

8.     This has been the common means by which TPS beneficiaries with final removal orders adjust their status and the standard tool employed by advocates on their behalf.

9.     On December 20, 2019, Defendants, without explanation, foreclosed this practice and announced through a "policy alert" issued by the Office of the Director of USCIS and posted to the USCIS website that they were "updating the USCIS Policy Manual to clarify" that "TPS beneficiaries who had outstanding, unexecuted final removal orders at the time of departure, remain TPS beneficiaries ***who continue to have outstanding, unexecuted final removal orders upon lawful return***."[3]

10.     Though masked as a mere "clarification," the TPS Policy Alert created a new rule that changed the legal effect of traveling with prior USCIS consent for TPS beneficiaries and ensures that USCIS will not view an applicant's removal order as executed even though, under

---

[3] USCIS, *Policy Alert: Effect of Travel Abroad by Temporary Protected Status Beneficiaries with Final Orders of Removal* (Dec. 20, 2019), https://perma.cc/5A6E-3Z5P (emphasis added) (hereinafter the "TPS Policy Alert").

the statutory scheme, prior practice, and settled expectations of stakeholders, that should be an automatic consequence of their departure. Accordingly, potentially tens of thousands of TPS beneficiaries with final removal orders are now barred from adjusting their status through USCIS, notwithstanding their departure from the United States and lawful return with prior USCIS consent.

11.     Devastatingly, this substantial barrier to LPR status comes at a time when the need for a more secure status is paramount for TPS beneficiaries. In a series of separate actions, Defendants have taken steps to end TPS protections for beneficiaries from a number of covered countries, including Sudan, Nicaragua, Nepal, Honduras, Haiti, and El Salvador.[4] Thus, the TPS Policy Alert leaves TPS beneficiaries from those countries vulnerable to removal based on their prior orders of removal, now viewed by Defendants as unexecuted.

12.     In doing so, the TPS Policy Alert upsets USCIS's past practice, imposing a new, nationwide standard for USCIS officials that collides with the plain language of the INA, which states that any immigrant "ordered deported or removed … **who has left the United States**, shall be considered to have been deported or removed in pursuance of law." 8 U.S.C. § 1101(g) (emphasis added).

13.     Defendants enacted this new policy without even acknowledging that a shift from past practice had taken place, let alone explaining their reasoning for this change. Given that the TPS Policy Alert drastically alters the ability of TPS beneficiaries to adjust status to LPR,

---

[4] *See* 82 Fed. Reg. 47,228 (Oct. 11, 2017) (Sudan); 82 Fed. Reg. 59,636 (Dec. 15, 2017) (Nicaragua); 83 Fed. Reg. 23,705 (May 22, 2018) (Nepal); 83 Fed. Reg. 26,074 (June 5, 2018) (Honduras); 83 Fed. Reg. 2,648 (July 22, 2019) (Haiti); 83 Fed. Reg. 2,654 (Sept. 9, 2019) (El Salvador).

Defendants must articulate considered rationales for this seismic policy shift—that much (at the very least) is legally required.

14.     Leaving aside Defendants' lack of consideration of the relevant reliance interests or any reasoned explanation for their change, the true reason for the TPS Policy Alert is clear: there is ample evidence that Defendants were motivated to enact the TPS Policy Alert by their animus against immigrants of color, and especially those who hold TPS status, whom the President has derided as purportedly emigrating from "shithole countries" unworthy of America's protection.[5]

15.     This change was also enacted by, at the direction of, and under the authority and supervision of, an unlawful acting official: Kenneth T. Cuccinelli II, who was then purporting to serve as the Acting Director of USCIS and who is now described as the Senior Official Performing the Duties of the Director of USCIS. As a court in this District has already held, Mr. Cuccinelli did not satisfy the legal requirements to serve as Acting USCIS Director under the Federal Vacancies Reform Act ("FVRA").

16.     Separately, former Acting Secretary Kevin McAleenan—the official responsible for installing Mr. Cuccinelli as the Acting Director of USCIS—was himself unlawfully exercising authority he did not possess, as the Government Accountability Office ("GAO") recently found,[6] and so Mr. Cuccinelli's installation and subsequent service was invalid for that reason, as well.

---

[5] Ali Vitali et al., *Trump Referred to Haiti and African Nations as 'Shithole' Countries*, NBC News (Jan. 11, 2018), https://perma.cc/9FTY-QZ5P.

[6] *See* US GAO, Decision: B-331650*, Matter of: Department of Homeland Security—Legality of Service of Acting Secretary of Homeland Security and Service of Senior Official Performing the Duties of Deputy Secretary of Homeland Security* (Aug. 14, 2020) (hereinafter *GAO Decision*), https://perma.cc/TU6G-YCBD.

17.     Under either theory, the result is the same: Policies adopted under Mr. Cuccinelli's authority as Acting USCIS Director, including the TPS Policy Alert, are invalid. *See L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 35-36 (D.D.C. 2020), *appeal dismissed*, No. 20-5141 (Aug. 13, 2020).

18.     The TPS Policy Alert has inflicted, and is inflicting, substantial irreparable harm on the plaintiffs in this suit.

19.     Defendants, through the TPS Policy Alert, have effectively barred the Individual Plaintiffs from seeking to adjust their status to lawful permanent resident. Each of the Individual Plaintiffs is a TPS beneficiary with a prior order of removal who has departed from the United States, returned lawfully under a grant of advance parole, and would be otherwise eligible to adjust their status with USCIS. But for the TPS Policy Alert, each of the Individual Plaintiffs would be eligible to apply to adjust their status directly to LPR through USCIS.

20.     In light of the fact that Defendants are simultaneously seeking to end the TPS program in its entirety, the TPS Policy Alert also puts the Individual Plaintiffs at imminent risk of being removed from the United States—separated from their U.S. citizen or LPR family members, communities, and livelihoods, and removed to a country from which they long ago fled and to which each fears being returned. Unless and until the TPS Policy Alert is set aside, such that TPS beneficiaries may obtain the proper legal benefit of their departure and lawful return—*i.e.*, eligibility to apply for adjustment of status to LPR through USCIS—these harms will continue.

21.     Defendants, through the TPS Policy Alert, have also harmed CARECEN by impeding its ability to provide legal counseling services relating to the TPS program to the

Central American immigrant community it aims to serve, forcing it to divert resources, and causing direct financial harm due to the client relationships CARECEN is no longer able to form.

22.     For these reasons, and as described more fully below, the Court should declare that the TPS Policy Alert is unlawful, vacate that policy, enjoin Defendants from continuing to process applications for adjustment of status in accordance with it, order Defendants to reprocess those Individual Plaintiffs whose applications for adjustment of status have already been denied, and declare that both the TPS Policy Alert and Mr. Cuccinelli's appointment as Acting USCIS Director were unlawful.

### JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this action arises under federal law.

24.     Venue is proper in this district under 28 U.S.C. § 1391(e) because Defendants are officers and agencies of the United States and are located in the District of Columbia.

### PARTIES

25.     As described further below, each of the Individual Plaintiffs is a TPS beneficiary with a prior order of removal or deportation. Each has departed from the United States, with USCIS authorization, and lawfully returned under a grant of advance parole. The procedural posture of their immigration cases differ,[7] but they are joined through the common harm each has suffered as a consequence of the TPS Policy Alert, which impedes their respective abilities to adjust their status to that of LPR.

---

[7] The applications of Ms. Romero, Mr. Velasco, Ms. Hernandez, and Ms. Bazile have already been denied by USCIS; Mr. Medina's remains pending; and Ms. Alvarez and Ms. Ramirez are eager to apply but have so far abstained from doing so because of the TPS Policy Alert.

26.     Plaintiff **Blanca Mirna Romero del Cid** is a national of El Salvador who has lived in the United States for approximately 26 years. She presently resides in Virginia with her four U.S. citizen children. She has been a TPS beneficiary since 2002.

27.     Ms. Romero entered the United States without inspection in 1994 and later applied for asylum through her husband. After her case was referred to an immigration judge, she was granted voluntary departure on October 15, 1998. Ms. Romero did not leave the United States, which caused an alternate order of removal to be automatically entered against her.

28.     In 2013, Ms. Romero applied for an advance parole travel document with Form I-131 (Application for Travel Document), which USCIS granted. She then went back to El Salvador for a brief period of time, and lawfully returned on July 12, 2013 by presenting her advance parole document to an officer who stamped her passport and allowed her to enter the United States.

29.     On July 27, 2018, Ms. Romero's oldest son, Joel, who is a U.S. citizen, filed a Petition for Alien Relative (Form I-130) with USCIS to demonstrate her qualifying relationship to a U.S. citizen for purposes of adjusting her status to LPR. At the same time, Ms. Romero submitted her application for adjustment of status (Form I-485). On January 15, 2020, USCIS granted the I-130 petition, but denied her I-485 adjustment application, contending that it did not have jurisdiction over her application because her removal order remained outstanding.

30.     On information and belief, the TPS Policy Alert was the basis for USCIS denying Ms. Romero's application for adjustment.

31.     Ms. Romero is now left vulnerable to removal although she would take all steps necessary to again have USCIS consider her application for adjustment of status if the TPS Policy Alert were set aside.

32.     Plaintiff **Jose Oscar Velasco Garcia** is a national of El Salvador who has lived in the United States for approximately 27 years. He currently lives in Virginia with his U.S. citizen wife and two U.S. citizen children, where he also runs his own business. He has been a TPS beneficiary since 2001.

33.     After entering the United States without inspection, Mr. Velasco applied for asylum and his case was referred to an immigration judge. When Mr. Velasco arrived at the immigration court for his scheduled hearing, he learned that he had been ordered deported in absentia seven months earlier, on August 28, 1995, because the hearing had been rescheduled without his knowledge.

34.     In 2016, Mr. Velasco applied for an advance parole travel document with Form I-131 (Application for Travel Document), which USCIS granted. He then briefly traveled back to El Salvador, lawfully returning to the United States on August 8, 2016, after presenting his advance parole document to an officer who stamped his passport and allowed him to enter the United States.

35.     On May 29, 2018, Mr. Velasco's U.S. citizen wife filed a Petition for Alien Relative (Form I-130) with USCIS to demonstrate his qualifying relationship to a U.S. citizen for purposes of adjusting his status. At the same time, Mr. Velasco filed an application for adjustment of status (Form I-485). USCIS approved the I-130 petition on May 16, 2020, but denied Mr. Velasco's adjustment of status application on May 22, 2020, contending that his departure from the United States in 2016 did not execute the in absentia deportation order he received in 1995.

36.     On information and belief, the TPS Policy Alert was the basis for USCIS denying Mr. Velasco's application for adjustment of status.

37.     Mr. Velasco is now left vulnerable to deportation although he would take all steps necessary to again have USCIS consider his application for adjustment of status if the TPS Policy Alert were set aside.

38.     Plaintiff **Vilma Haydee Hernandez** is a national of El Salvador who has lived in the United States for approximately the past 20 years. She currently resides in Washington, D.C. with her U.S. citizen husband and two U.S. citizen children. She has been a TPS beneficiary since 2001.

39.     Ms. Hernandez entered into the United States without inspection in October 2000 and was detained by immigration authorities upon entering and placed in removal proceedings. Ms. Hernandez was ordered removed in absentia in February 2001, which she learned of only after she had received TPS protection and work authorization.

40.     In 2014, Ms. Hernandez submitted Form I-131 (Application for Travel Document) to apply for an advance parole travel document, which USCIS approved. She then traveled to El Salvador for a brief period, and lawfully returned to the United States on August 22, 2014 after presenting her advance parole document to an officer who stamped her passport and allowed her to enter the country.

41.     On March 18, 2019, Ms. Hernandez's U.S. citizen husband filed a Petition for Alien Relative (Form I-130) with USCIS to demonstrate her qualifying relationship to a U.S. citizen for purpose of adjusting status. At the same time, Ms. Hernandez filed an application for adjustment of status (Form I-485). USCIS approved her Form I-130 on March 4, 2020, but denied her application for adjustment of status, claiming that it lacked jurisdiction over her application because it views her removal order as not executed despite her departure from the United States in 2014.

10

42.     On information and belief, the TPS Policy Alert was the basis for USCIS denying Ms. Hernandez's application for adjustment of status.

43.     Ms. Hernandez is now left vulnerable to removal although she would take all steps necessary to have USCIS consider her application for adjustment of status if the TPS Policy Alert were set aside.

44.     Plaintiff **Heroldine Bazile** is a national of Haiti who has lived in the United States since she was eight months old. She currently resides in Miami, Florida with her U.S. citizen father and two younger U.S. citizen sisters. She has been a TPS beneficiary since 2011.

45.     Ms. Bazile's mother brought her to the United States seeking safety for her and her family, but an immigration judge denied their asylum application and ordered them removed from the United States. Ms. Bazile remained in the United States with her family.

46.     In 2013, USCIS approved Ms. Bazile's Form I-131 (Application for Travel Document). Ms. Bazile traveled to the Bahamas with her family and lawfully returned to the United States on December 24, 2013 after presenting her advance parole document to an officer who stamped her passport and allowed her to enter the country.

47.     On March 28, 2014, Ms. Bazile's U.S. citizen father filed a Petition for Alien Relative (Form I-130) with USCIS to demonstrate her qualifying relationship to a U.S. citizen for purpose of adjusting status. At the same time, Ms. Bazile filed an application for adjustment of status (Form I-485) with USCIS. USCIS approved Form I-130 on June 25, 2015, but did not issue a decision on the adjustment of status application.

48.     On September 29, 2017, Ms. Bazile filed a new application for adjustment of status (Form I-485). USCIS denied the application for adjustment of status on August 3, 2020

11

claiming that it lacked jurisdiction over her application because it views her removal order as not executed, despite her departure in 2013 from the United States.

49.    On information and belief, the TPS Policy Alert was the basis for USCIS denying Ms. Bazile's application for adjustment of status.

50.    Ms. Bazile is now left vulnerable to removal although she would take all steps necessary to have USCIS consider her application for adjustment of status if the TPS Policy Alert were set aside.

51.    Plaintiff **Juan Francisco Medina** is a national of El Salvador who has lived in the United States for approximately 30 years. He currently resides in Maryland with his LPR wife and two U.S. citizen children. He has been a TPS beneficiary since 2001.

52.    Mr. Medina entered the United States without inspection in 1990, and was detained by immigration authorities, released on bond, and referred to the immigration court for deportation proceedings. He applied for asylum, but was ordered deported in absentia by an immigration judge on February 19, 1991.

53.    On several occasions since he began living in the United States, Mr. Medina has obtained authorization from USCIS to travel to El Salvador, lawfully returning to the United States each time with an advance parole document. Mr. Medina's last entry was on September 15, 2019. On that occasion, after presenting his advance parole document to an officer who stamped his passport, Mr. Medina was allowed to enter the United States.

54.    On December 6, 2019, Mr. Medina's U.S. citizen daughter, Zuleyma, filed a Petition for Alien Relative (Form I-130) with USCIS to demonstrate Mr. Medina's qualifying relationship to a U.S. citizen for purposes of adjusting status. At the same time, Mr. Medina filed an application for adjustment of status (Form I-485).

55.     Mr. Medina's forms remain pending before USCIS, but, on information and belief, because of the TPS Policy Alert and unless it is set aside, USCIS will likely deny Mr. Medina's application for adjustment of status.

56.     If USCIS does not grant Mr. Medina's adjustment application, he will be left vulnerable to deportation.

57.     Plaintiff **Maria Floriselda Alvarez Gomez** is a national of El Salvador who has lived in the United States for the past 25 years. She lives in Virginia with her four U.S. citizen children. She has been a TPS beneficiary since 2001.

58.     Following her entrance without inspection, Ms. Alvarez was detained by immigration authorities and placed into deportation proceedings. An immigration judge granted Ms. Alvarez voluntary departure on April 16, 1996, but she did not depart and so an alternate order of deportation was automatically entered against her.

59.     In 2018, Ms. Alvarez applied for an advance parole travel document with Form I-131 (Application for Travel Document), which USCIS granted. She then traveled to El Salvador for a brief period of time and lawfully returned on September 17, 2018, after presenting her advance parole document to an officer who stamped her passport and allowed her to enter the United States.

60.     On March 18, 2019, Ms. Alvarez's U.S. citizen daughter filed a Petition for Alien Relative (Form I-130) with USCIS to demonstrate her qualifying relationship to a U.S. citizen for purposes of adjusting her status. Ms. Alvarez intended to then submit an application for adjustment of status (Form I-485), and still wishes to adjust her status to LPR, but, even though USCIS approved her I-130 on June 4, 2020, she has refrained from submitting her Form I-485.

On information and belief, the TPS Policy Alert would cause USCIS to deny that application, making it futile and wasteful for her to apply unless the TPS Policy Alert is set aside.

61.     Ms. Alvarez is now left vulnerable to deportation although she would take all steps necessary to have USCIS consider her application for adjustment of status if the TPS Policy Alert were set aside.

62.     Plaintiff **Yolanda Maritza Ramirez Martinez** is a national of El Salvador who has lived in the United States for approximately 22 years. She currently resides in Virginia with her U.S. citizen husband and one of her two U.S. citizen children. She has been a TPS beneficiary since 2001.

63.     After entering without inspection in 1998, Ms. Ramirez was detained by immigration authorities and placed in removal proceedings. She was subsequently ordered removed in absentia by an immigration judge on January 5, 1999.

64.     In 2013, Ms. Ramirez's U.S. citizen husband filed a Petition for Alien Relative (Form I-130) with USCIS to demonstrate her qualifying relationship to a U.S. citizen for purposes of adjusting status. USCIS approved her Form I-130 on September 30, 2013.

65.     In the spring of 2014, Ms. Ramirez submitted Form I-131 (Application for Travel Document) to apply for an advance parole travel document, which USCIS approved. Ms. Ramirez then departed the United States and went back to El Salvador for a brief period of time. She lawfully returned to the United States in May 2014 after presenting her advance parole document to an officer who stamped her passport and allowed her to enter the country.

66.     Ms. Ramirez intended to submit an application for adjustment of status (Form I-485) through USCIS, and still wishes to adjust her status, but has refrained from doing so to date. On information and belief, the TPS Policy Alert would cause USCIS to deny her application,

making it futile for her to apply until the TPS Policy Alert is set aside. She would promptly apply for adjustment if the TPS Policy Alert were set aside.

67.     Instead, and as a result of the TPS Policy Alert, Ms. Ramirez is left vulnerable to removal.

68.     Plaintiff **CARECEN** is a non-profit corporation organized under the laws of the District of Columbia. CARECEN works to foster the comprehensive development of the Latino population in the Washington metropolitan region through the direct provision of legal counseling and community education services on a range of issues, including immigration matters, housing and personal finance matters, and citizenship and naturalization. Among other low- or no-cost services, CARECEN advises individuals on the TPS program, including on eligibility, how to obtain and maintain good status and work authorization under that program, how to seek approval to travel outside of the United States, and, importantly, how eligible TPS beneficiaries can adjust status to LPR.

69.     Defendant **Kenneth T. Cuccinelli II** is sued in his official capacity as the Senior Official Performing the Duties of the Director of U.S. Citizenship and Immigration Services.

70.     Defendant **USCIS** is a federal agency headquartered in Washington, DC, at 20 Massachusetts Ave NW, Washington, DC 20529. It was established through the Homeland Security Act of 2002 ("HSA") as a subagency of the Department of Homeland Security and consolidated various Executive Branch immigration functions within the Department. *See* Pub. L. No. 107-296, Subtitle E, 116 Stat. 2195 (2002), *codified at* 6 U.S.C. § 271 *et seq*.

71.     Defendant **Chad Wolf** is sued in his official capacity as Acting Secretary of Homeland Security.

72.     Defendant **U.S. Department of Homeland Security** ("DHS") is a federal agency headquartered in Washington, DC at 2707 Martin Luther King Jr Ave SE, Washington, DC 20528.

## LEGAL BACKGROUND

### I.     The Temporary Protected Status Program

73.     Pursuant to the Immigration Act of 1990, Pub. L. 101-649, § 302, 104 Stat. 4978, 5030, which is codified in the INA as 8 U.S.C. § 1254a, the Secretary of Homeland Security (the "Secretary")[8] is authorized to designate foreign states experiencing armed conflict, natural disaster, epidemic, or other extraordinary conditions, and to grant TPS to the nationals of designated countries. 8 U.S.C. § 1254a.[9]

74.     Nationals of a designated country can be granted TPS if they have been physically present in the United States since the effective date of the Secretary's designation and satisfy certain residency, registration, and admissibility requirements. 8 U.S.C. § 1254a(c).

75.     When the Secretary grants TPS to an individual, the government is prohibited from removing that individual during the period in which such status is in effect and, moreover, is required to authorize the TPS beneficiary to engage in employment. 8 U.S.C. § 1254a(a)(1). TPS also provides the beneficiary with the ability to "travel abroad with the prior consent" of the government. *Id.* § 1254a(f)(3).

---

[8] As of March 1, 2003, in accordance with section 1517 of title XV of the Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135, any reference to the Attorney General in a provision of the INA describing functions transferred from the Department of Justice to the Department of Homeland Security "shall be deemed to refer to the Secretary" of Homeland Security. *See* 6 U.S.C. § 557.

[9] Congress amended the Immigration Act of 1990, including the portion establishing TPS, with certain technical corrections the following year. *See* Miscellaneous and Technical Immigration and Naturalization Amendments of 1991 ("MTINA"), Pub. L. 102–232, Dec. 12, 1991, 105 Stat 1733 § 304.

76.     El Salvador, Haiti, Honduras, Nepal, Nicaragua, Somalia, Sudan, South Sudan, Syria, and Yemen are currently designated for TPS.[10] As of November 2018, over 400,000 people were beneficiaries of TPS.[11]

77.     Beginning in October 2017, Defendants announced terminations of the TPS designations for Sudan,[12] Nicaragua,[13] Nepal,[14] Honduras,[15] Haiti,[16] and El Salvador.[17]

78.     Defendants are presently enjoined by court orders from implementing those terminations,[18] and have since announced that, "to ensure [their] continued compliance" with those court orders, beneficiaries of the TPS designations for Sudan, Nicaragua, Nepal, Honduras, Haiti, and El Salvador will retain their TPS protection and work authorization while the preliminary injunctions remain in effect.[19]

79.     An order setting aside or staying the district court injunctions could issue imminently. Briefing in *Ramos*, for example, has been completed since October 2019.[20]

---

[10] *Temporary Protected Status*, USCIS (Mar. 30, 2020), https://perma.cc/2EUK-RWWY.

[11] *Total Number of Current I-821 Temporary Protected Status (TPS) Individuals as of November 29, 2018*, USCIS (Nov. 29, 2018), https://perma.cc/WTN3-B483.

[12] 82 Fed. Reg. 47,228 (Oct. 11, 2017).

[13] 82 Fed. Reg. 59,636 (Dec. 15, 2017).

[14] 83 Fed. Reg. 23,705 (May 22, 2018).

[15] 83 Fed. Reg. 26,074 (June 5, 2018).

[16] 83 Fed. Reg. 2,648 (July 22, 2019).

[17] 83 Fed. Reg. 2,654 (Sept. 9, 2019).

[18] *See Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1108 (N.D. Cal. 2018) (granting preliminary injunctions against de-designation of Sudan, Nicaragua, Haiti and El Salvador), *appeal filed*, No. 18-16981 (9th Cir. 2018); *see also Saget v. Trump*, 375 F. Supp. 3d 280, 378 (E.D.N.Y. 2019) (enjoining termination of Haiti's TPS on nationwide basis).

[19] 84 Fed. Reg. 59,403, 59,403 (Nov. 4, 2019).

[20] *See Ramos v. Nielsen*, No. 18-16981 (9th Cir. Oct. 7, 2019), ECF No. 84 (post-argument briefing submitted).

II.    **Adjustment of Status**

80.    The Secretary and Attorney General are authorized to adjust the status of

noncitizens present in the United States to that of an LPR under certain conditions. 8 U.S.C.

§ 1255.

81.    LPR status confers many important benefits. Unlike most other noncitizens,

permanent residents are indefinitely authorized to live and work in the United States. *See* 8

U.S.C. § 1101(a)(20) (defining "lawfully admitted for permanent residence").[21] Further, only

permanent residents are eligible to become naturalized U.S. citizens. 8 U.S.C. § 1427.

82.    Adjustment of status is available for, among others, an applicant who is the

immediate relative of a U.S. citizen. Thus, adjustment is available to the spouses of U.S. citizens,

the unmarried children (younger than 21 years) of U.S. citizens, or the parents of U.S. citizen

children (who are 21 years of age or older). *See* 8 U.S.C. 1151(b)(2)(A)(i). USCIS Form I-130,

Petition for Alien Relative, is used to establish the existence of this qualifying relationship.

83.    Adjustment applicants must also meet certain eligibility prerequisites, including

that they: (1) have been inspected and admitted or paroled into the United States; (2) are eligible

to receive an immigrant visa; (3) are admissible to the United States; and (4) have an immigrant

visa immediately available to them at the time the application is filed. 8 U.S.C. § 1255(a).

84.    If the applicant meets all prerequisites, the applicant will file USCIS Form I-485,

Application to Register Permanent Residence or Adjust Status, to apply for adjustment with

whichever agency has jurisdiction. If the applicant is inadmissible and is eligible to seek a waiver

of inadmissibility, the applicant may also file Form I-601 and/or Form I-212—depending on

---

[21] *See also* USCIS, Welcome to the United States: A Guide for New Immigrants 14-15 (2015),
https://perma.cc/7V4D-ZCZ6.

which inadmissibility grounds may have been triggered—with the adjustment application

seeking to have pertinent inadmissibility grounds waived.

85.   Two agencies exercise jurisdiction over applications for adjustment of status:

USCIS and the Executive Office for Immigration Review ("EOIR"), the component of the U.S.

Department of Justice that presides over immigration court proceedings to remove noncitizens

from the United States.

86.   USCIS adjudications are conducted using a benefit administration model. USCIS

adjudicators are trained to conduct non-adversarial interviews to determine eligibility for the

requested benefit.

87.   By contrast, EOIR adjudications are conducted through adversarial litigation.

EOIR's immigration judges preside over removal proceedings in which DHS attorneys serve as

prosecutors and where adjustment of status operates as an affirmative defense to DHS's charge

that a noncitizen should be removed from the United States.

88.   USCIS has jurisdiction to adjudicate an application for adjustment of status filed

by any noncitizen unless EOIR—*i.e.*, the immigration judge—has jurisdiction. 8 C.F.R.

§ 245.2(a)(1).

89.   With limited exception, EOIR has exclusive jurisdiction over adjustment

applications made by noncitizens in removal proceedings,[22] including those with unexecuted

removal orders. Noncitizens with unexecuted removal orders remain under the jurisdiction of

---

[22] Individuals placed in removal proceedings as "arriving aliens" are not part of this scheme. An "arriving alien" is "an applicant for admission coming or attempting to come into the United States at a port-of-entry, or an alien seeking transit through the United States at a port-of-entry, or an alien interdicted in international or United States waters and brought into the United States by any means, whether or not to a designated port-of-entry, and regardless of the means of transport." 8 C.F.R. § 1.2.

EOIR, and, the immigration court that adjudicated the removal proceeding will retain exclusive jurisdiction to adjudicate any application for adjustment of status the noncitizen may file. 8 C.F.R. § 1245.2(a)(1). Thus, even for noncitizens with unexecuted orders of removal that are many years old, the immigration court that issued the order will retain exclusive jurisdiction over any adjustment application.

90.     Before EOIR will consider an adjustment application filed on behalf of an immigrant under an unexecuted order of removal, however, the removal proceedings themselves must be reopened. Reopening is generally unavailable to those who become eligible for adjustment more than 90 days after the removal order is entered and to those who have departed the United States while the removal order was effective, *see* 8 C.F.R. §§ 1003.23(b)(1), 1003.2, meaning that some number of TPS beneficiaries with removal orders are entirely foreclosed from seeking adjustment of status with EOIR.[23]

91.     By contrast, if the removal order is considered to have been executed, EOIR's jurisdiction over any adjustment application terminates, and, the subject of the executed order may file their application to adjust status with USCIS.[24]

92.     The net effect of these policies is that if the removal order has been executed, USCIS is obliged to exercise jurisdiction over and determine the merits of an application for

---

[23] *See also Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure*, Dep't pf Justice, Executive Office for Immigration Review, EOIR Docket No. 19-0022; A.G. Order No. 4800-2020 (Aug. 20, 2020) (publication forthcoming) (proposing to "withdraw the . . . authority of the BIA and immigration judges to *sua sponte* reopen a case . . . except in limited circumstances evincing a need to correct typographical errors or defective service").

[24] *See Policy Manual*, USCIS ("*USCIS Policy Manual*") at Vol. 7, Pt. A, Ch. 3 (last updated Jun. 18, 2020), https://perma.cc/HK7N-MZX5 ("Except if the applicant is an "arriving alien," the IJ (and not USCIS) has jurisdiction if an applicant is in removal proceedings, even if the proceedings have been administratively closed or if there is a final order of deportation or removal which has not yet been executed.").

adjustment of status. If the removal order has not been executed, only EOIR has jurisdiction *and* the limitations on motions to reopen will generally prevent EOIR from reaching the merits of an adjustment application.

93.      The INA clearly defines when an order of removal is deemed to have been executed. Specifically, it provides that "***any*** alien ordered deported or removed … ***who has left the United States, shall be considered to have been deported or removed in pursuance of law***, irrespective of the source from which the expenses of his transportation were defrayed or the place to which he departed." 8 U.S.C. § 1101(g) (emphasis added). Therefore, once a deportation or removal order has been executed, which happens upon an individual's departure, jurisdiction flows to USCIS, which must exercise its jurisdiction to adjudicate any adjustment applications.

94.      In conformity with that statutory language, and under prior USCIS policy or practice, a TPS beneficiary subject to a final removal order who had left the country and then lawfully returned, generally under a grant of advance parole was deemed to have executed the removal order, thus transferring jurisdiction over the TPS beneficiary's adjustment application to USCIS.

### III.      <u>Adjustment of Status for TPS Beneficiaries with Final Removal Orders</u>

95.      TPS beneficiaries who have a qualifying relationship to a U.S. citizen may apply to adjust their status but will often encounter two difficulties:

96.      First, because many TPS beneficiaries initially entered the United States without inspection, they will be ineligible to adjust status because they have not been "inspected and admitted or paroled into the United States," as is required. 8 U.S.C. § 1255(a).

97.      Second, because many TPS beneficiaries have final orders of removal following their initial entrance without inspection, they are unable to adjust status through USCIS as jurisdiction lies with EOIR.

98.     EOIR, however, requires the removal order to be reopened before adjustment is possible. The process required to reopen the removal order is a highly discretionary, complex, and potentially time- and resource-intensive process.

99.     Historically, however, these impediments to adjustment through USCIS could be overcome through travel abroad and lawful return with prior USCIS consent.

100.     In particular, the Secretary is authorized to parole an applicant for admission into the United States for urgent humanitarian reasons or significant public benefit. 8 U.S.C. § 1182(d)(5). The Secretary has long authorized immigration officers to issue advance parole documents to noncitizens currently in the United States who wish to travel abroad temporarily. *See* 8 C.F.R. § 212.5(f). In the TPS statute, Congress specifically authorized "travel abroad with the prior consent" of the agency, *see* 8 U.S.C. § 1254a(f)(3); *see also* MTINA § 304(c)(2). USCIS has routinely granted advance parole to TPS beneficiaries. *See* 8 C.F.R. § 244.15.

101.     Moreover, USCIS has historically deemed travel and return on advance parole to execute an order of removal,[25] which has the further effect of vesting USCIS with exclusive jurisdiction over a subsequently filed adjustment application.

102.     And, upon lawfully returning with prior USCIS consent shown through a grant of advance parole, the TPS beneficiary would have met the requirement that an applicant for

---

[25] *See, e.g.*, U.S. Dep't of Justice, INS General Counsel's Office, Memorandum: Advanced Parole for TPS Eligible Aliens in Deportation Proceedings, Genco Op. No. 91-49 (INS), 1991 WL 1185160, at *3 (June 17, 1991) (stating that "a TPS alien who departs the United States while a deportation order is in effect carries out his or her own deportation" but that "[t]his consequence of the alien's departure need not . . . frustrate the alien's ability to travel abroad while in TPS" under advance parole); *Matter of R-D-S-B-*, 2018 WL 5581636, at *2–3 (AAO Oct. 26, 2018) (concluding that TPS recipient's "departure executed his final order of removal"); [Name redacted], 2013 WL 5504876, at *3 (AAO Feb. 22, 2013) (unpublished) (concluding that TPS recipient's departure on advance parole "executed his final order of removal"); *cf. Nken v. Holder*, 556 U.S. 418, 440 (2009) ("Removal orders 'are self-executing orders, not dependent upon judicial enforcement.'") (quoting *Stone v. INS*, 514 U.S. 386, 398 (1995)).

adjustment has been "inspected and admitted or paroled into the United States." 8 U.S.C. §
1255(a).[26] At that point, the individual would be eligible to apply and jurisdiction will
exclusively lie with USCIS.

103.     In short, under Defendants' past policy and practice, a TPS beneficiary with a
qualifying relationship to a U.S. citizen, who had a final removal order, had departed the country
and lawfully returned with prior USCIS consent shown through a grant of advance parole (and
was not otherwise inadmissible) would be eligible to apply for adjustment of status using Form I-
485, and would be entitled to have USCIS exercise jurisdiction over that application. The TPS
Policy Alert rescinds the policy or practice that permitted such TPS beneficiaries to apply for
adjustment through USCIS and does so for all USCIS field offices, nationwide.

### IV.     The Rules Governing the Appointment of Constitutional Officers

104.     Because the TPS Policy Alert was issued by an unlawful acting official—*i.e.*, Mr.
Cuccinelli, the rules governing the appointment of constitutional officers are relevant to this
case. Specifically, the Appointments Clause, the Federal Vacancies Reform Act, and the
Homeland Security Act all operate to constrain the Executive in appointing constitutional
officers to fill important Executive Branch posts. Defendants ignored those constraints in
installing Mr. Cuccinelli at USCIS.

105.     The Constitution mandates a role for the United States Congress in the
appointment of officers of the United States. This important role is enshrined in the
Appointments Clause, which states that officers of the United States may be appointed by the

---

[26] *See USCIS Policy Manual*, at Vol. 7, Part B, Ch. 2 ("If an alien under TPS departs the United
States and is admitted or paroled upon return to a port of entry, the alien meets the inspected and
admitted or inspected and paroled requirement provided the inspection and parole occurred
before he or she filed an adjustment application [for adjustment].").

President only "by and with the Advice and Consent of the Senate." U.S. Const. art. II, § 2, cl. 2. It further provides that only Congress, "by Law," may vest the appointment of inferior officers in the President, the courts, or in the heads of departments, "as they [that is, the Congress] think proper." *Id.* Moreover, the Appointments Clause vests exclusive authority in Congress to "establish[] by Law" all Executive Branch offices. *Id.*

106.    The Appointments Clause "is more than a matter of etiquette or protocol'; it is among the significant structural safeguards of the constitutional scheme." *Edmond v. United States*, 520 U.S. 651, 659 (1997) (quoting *Buckley v. Valeo*, 424 U.S. 1, 125 (1976)). These "significant structural safeguards" apply to the appointment of all officers—that is, any person afforded "significant authority pursuant to the laws of the United States," *Buckley*, 424 U.S. at 126, or who has "significant discretion" in their exercise of Executive Branch authority, *Lucia v. SEC*, 138 S. Ct. 2044, 2047 (2018).

107.    Recognizing that "[t]he constitutional process of Presidential appointment and Senate confirmation … can take time," "Congress has given the President limited authority to appoint acting officials … without first obtaining Senate approval." *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 935 (2017). The Federal Vacancies Reform Act "is the most recent iteration of that interbranch accommodation." *Guedes v. ATF*, 920 F.3d 1, 11 (D.C. Cir. 2019).

108.    The FVRA permits an individual to serve in an acting capacity whenever "an officer of an Executive agency (including the Executive Office of the President, and other than the Government Accountability Office) whose appointment to office is required to be made by the President, by and with the advice and consent of the Senate, dies, resigns, or is otherwise unable to perform the functions and duties of the office." 5 U.S.C. § 3345(a).

109.    When that happens, the FVRA prescribes a default rule: "the first assistant to the office of such officer shall perform the functions and duties of the office temporarily in an acting capacity." 5 U.S.C. § 3345(a)(1); *see also Guedes*, 920 F.3d at 11 ("The default is for the 'first assistant' to take the helm.").

110.    "The next two paragraphs of § 3345(a) identify alternatives." *S.W. General, Inc.*, 137 S. Ct. at 936. Specifically, the President may select another individual to temporarily fill the vacancy if he or she "serves in an office for which appointment is required to be made by the President, by and with the advice and consent of the Senate," 5 U.S.C. § 3345(a)(2), or if they "served in a position in [the] agency for not less than 90 days" at the GS-15 rate of pay. *Id.* § 3345(a)(3). Reflecting the FVRA's aim of providing the President with *limited* authority to name acting officials, these provisions allow the President to deviate from the FVRA's first assistant default rule and select someone else only if that person has either received the Senate's approval or have met certain seniority requirements. *See id.*

111.    The FVRA further provides that actions taken to perform functions and duties vested in a Senate-confirmed office that are "taken by any person who is not acting" lawfully under the statute "shall have no force or effect," and "may not be ratified." 5 U.S.C. §§ 3348(d)(1-2).

112.    Generally speaking, the FVRA provides "the exclusive means for temporarily authorizing an acting official to perform the functions and duties of" a constitutional officer. 5 U.S.C. § 3347(a). An exception is provided where an express statutory provision "authorizes the President, a court, or the head of an Executive department, to designate an officer or employee to perform the functions and duties of a specified office" as an acting official. *Id.* § 3347(a)(1).

113.    DHS's organic statute, the HSA, provides that, in the event of the "[a]bsence, disability, or vacancy of the Secretary or Deputy Secretary" and "[n]otwithstanding [the FVRA], the Under Secretary for Management shall serve as the Acting Secretary if by reason of absence, disability, or vacancy in office, neither the Secretary nor Deputy Secretary is available to exercise the duties of the Office of the Secretary." 6 U.S.C. § 113(g)(1). The HSA further grants the Secretary the authority to "designate such other officers of the Department in further order of succession to serve as Acting Secretary." *Id.* § 113(g)(2).

**V.    The Position of Director of USCIS**

114.    Only six officers are enumerated by USCIS's authorizing statute, the Homeland Security Act: (i) the Director; (ii) the Chief of Policy and Strategy, (iii) the Legal Advisor, (iv) the Budget Officer, (v) the Chief of the Office of Citizenship, and (vi) the Citizenship and Immigration Services Ombudsman. *See* 6 U.S.C. §§ 271, 272.

115.    USCIS's functions are divided among four program offices: Administrative Appeals; Equal Opportunity & Inclusion; Privacy; and Investigations; and seven directorates: External Affairs; Immigration Records & Identity Services; Field Operations; Fraud Detection & National Security; Management; Refugee, Asylum & International Operations; and Service Center Operations. The chiefs of each of these program offices and directorates report to the USCIS Deputy Director and Director.[27]

116.    The Director leads the agency, 6 U.S.C. § 271, and must be "appointed by the President, by and with the advice and consent of the Senate," *id.* § 113(a)(1)(E).

---

[27] *See* USCIS, U.S. Citizenship and Immigration Services Organization Chart (July 9, 2019), https://perma.cc/X5ET-GGCR.

117.    The position of Director is also endowed with the immigration benefit-granting authority previously held by the Commissioner of the now-defunct Immigration and Naturalization Service ("INS"). The Director thus has the sweeping authority to "establish the policies" underlying the adjudication of immigration petitions, to "oversee the administration of such policies," and to "establish national immigration services policies and priorities." *Id.* § 271. This includes, among other things, the adjudications of immigrant visa petitions, naturalization applications, asylum and refugee applications, *id.*, and, relevant to this lawsuit, applications for adjustment of status to LPR where the applicant is not in removal or deportation proceedings. 8 C.F.R. § 245.2(a)(1).

118.    The Director also oversees all personnel, infrastructure, and funding provided to support USCIS's functions. *See id.* § 271(b). That is a significant task. USCIS has approximately 19,000 employees and contractors working at more than 200 offices around the world,[28] and each day USCIS's workforce adjudicates more than 30,000 requests for immigration benefits, grants 2,200 applications for adjustment of status to LPR, and issues 4,000 "green cards."[29]

## FACTUAL ALLEGATIONS

## VI.    The Trump Administration's Reliance on Acting Officials

119.    Notwithstanding the mandate of the Appointments Clause, and in derogation of Congress's constitutional role in staffing the executive branch, the President has repeatedly chosen to fill positions with acting officials who have not obtained Senate confirmation. As of July 2019 the President had named at least 28 acting cabinet secretaries—more than *any* of the

---

[28] *See, e.g.*, *Mission and Core Values*, USCIS (July 5, 2020), https://perma.cc/5ZNJ-DJZA.

[29] *A Day in the Life of USCIS*, USCIS (May 13, 2020), https://perma.cc/JF8A-8FQ8.

past five presidents in their entire tenure in office.[30] And those acting cabinet officials served an average of 50 days, which is also longer than the average for any of the past five presidents.[31]

120.   Since that time, President Trump has added at least one more acting cabinet secretary: Defendant Chad Wolf, the current Acting Secretary of DHS, who replaced then-Acting Secretary of DHS Kevin McAleenan on November 13, 2019.[32] In total, the Administration has had a full cabinet of Senate-confirmed officials for only four months.[33]

121.   The President has been transparent in explaining that he prefers to use acting officials because it is easier and more expedient than seeking Senate confirmation. The President has stated:

   a.   "Well, I'm in no hurry. I have 'acting.' … I sort of like 'acting.' It gives me more flexibility."[34]

   b.   "It's OK. It's easier to make moves when they're acting." "I like acting because I can move so quickly. It gives me more flexibility."[35]

   c.   "Acting gives you much greater flexibility. A lot easier to do things."[36]

---

[30] Anne Joseph O'Connell, *Acting Leaders: Recent Practices, Consequences, and Reforms*, Brookings (July 22, 2019), https://perma.cc/VM7B-Q28 (hereinafter *Acting Leaders*).

[31] *Id.*

[32] *Leadership: Chad F. Wolf*, DHS (May 18, 2020), https://perma.cc/74TS-8ZVJ.

[33] Chiqui Esteban, *Who's in Charge? Many Months of Acting Cabinet Secretaries*, Wash. Post (July 24, 2019), https://perma.cc/9ABV-RY3X.

[34] Felicia Sonmez, *Trump Says He's 'in No Hurry' to Replace Acting Cabinet Members*, Wash. Post (Jan. 6, 2019), https://perma.cc/YL6Q-N2T5.

[35] *Transcript: President Trump on "Face the Nation,"* CBS News (Feb. 3, 2019), https://perma.cc/7SCM-TNAL.

[36] Editorial Board, *An Administration of Temps*, Bloomberg Opinion (July 25, 2019), https://perma.cc/36X9-W3LG (hereinafter *An Administration of Temps*).

d.    "I'm generally not going to make a lot of the appointments that would normally be—because you don't need them."[37]

122.    Purposefully staffing the executive branch with acting officials has serious repercussions not only for compliance with constitutional and statutory requirements, but also for accountable governance. Acting officials bypass the Senate's constitutional advice and consent role. They are thus "spared scrutiny by the Senate, which means less transparency in policy and fewer commitments for which office-holders might be held accountable."[38] Acting officials generally garner "diminished buy-in from the workers below them, relevant congressional committees, and the wider public."[39]

123.    Of particular relevance here, President Trump has repeatedly placed immigration and national security policy in the hands of acting officials. Specifically, "the Trump administration has filled many Homeland Security Department posts with acting officials installed for lengthy periods of time."[40] As of April 2020, only 35% of Senate-confirmed positions had been filled at the Department of Homeland Security.[41] In addition to USCIS, acting officials currently serve as, or exercise the duties of, the Secretary of Homeland Security, Deputy Secretary of Homeland Security, Director of Immigration and Customs Enforcement, and Commissioner of U.S. Customs and Border Protection ("CBP").

---

[37] Randall Lane, *Inside Trump's Head: An Exclusive Interview with the President, and the Single Theory That Explains Everything*, Forbes (Oct. 10, 2017), https://perma.cc/462L-LDCR#1cbb79fcbdec.

[38] *An Administration of Temps*, *supra* note 36.

[39] *Acting Leaders*, *supra* note 30.

[40] Ted Hesson & Anita Kumar, *Stephen Miller Ally Expected to Join Ken Cuccinelli at USCIS*, Politico (June 13, 2019), https://perma.cc/FW6Z-2UB.

[41] Garrett M. Graff, *Trump Broke the Agencies that Were Supposed to Stop the Covid-19 Epidemic*, Politico (Apr. 7, 2020), https://perma.cc/HS3R-P6H2.

VII. **Mr. Cuccinelli's Unlawful Appointment**

124.    To implement his anti-immigration agenda, of which the TPS Policy Alert is a part, President Trump, and members of his Administration, unlawfully appointed Defendant Kenneth T. Cuccinelli II to serve as Acting Director of USCIS. They did so through an end-run around the Appointments Clause of the Constitution, the FVRA, and the HSA's limited exception for establishing an order of succession.

125.    On April 25, 2017, Lee Francis Cissna was nominated by President Trump to serve as USCIS Director.[42] He was confirmed by the Senate on October 5, 2017 and took office on October 8, 2017.[43]

126.    On May 10, 2019, Mark Koumans was named Deputy Director of USCIS, and began his service on May 13, 2019.[44] At the time, the Deputy Director was designated as the first assistant to the office of the USCIS Director. Mr. Koumans is a "career federal employee" and served for years with Customers and Border Protection, Department of Homeland Security, and the U.S. Foreign Service.[45]

127.    On May 24, 2019, Director Cissna informed his employees via email that he would be resigning from the agency effective June 1, 2019. Mr. Cissna stated that he had

---

[42] Lee Francis Cissna, S. PN352, 115th Cong. (2017), https://perma.cc/K8PK-TJFM.

[43] *Id.*; *L. Francis Cissna*, USCIS (Apr. 06, 2020), https://perma.cc/DF8Z-K7FR.

[44] News Release, USCIS Names New Deputy Director (May 10, 2019) (hereinafter *USCIS Names New Deputy Director*), https://perma.cc/LZY2-6YJN; Letter from Jerrold Nadler, Chairman, House Comm. on the Judiciary, et al. to Kevin K. McAleenan, Acting Sec'y, DHS, at 1 (June 19, 2019), https://perma.cc/S4QR-A4Z2.

[45] *USCIS Names New Deputy Director*, *supra* note 44.

submitted his resignation "at the request of the president."[46] The President reportedly "forced the resignation of … Cissna" because he believed that Mr. Cissna "wasn't doing enough" to pursue the President's immigration agenda.[47] Specifically, the President's chief immigration adviser, Stephen Miller, had "been publicly agitating for weeks for Trump to fire Cissna."[48]

128.     Under the FVRA, Deputy Director Koumans—the first assistant to the Director—automatically became Acting Director of USCIS upon Mr. Cissna's termination. *See L.M.-M*. 442 F. Supp. 3d at 10.

129.     However, on June 10, 2019, DHS announced that Mr. Cuccinelli would serve as Acting Director of USCIS, effective that same day.[49]

130.     To appoint Mr. Cuccinelli as Acting Director, the Trump Administration created a new office of "Principal Deputy Director," designated the Principal Deputy Director as the first assistant to the USCIS Director for purposes of the FVRA, and appointed Mr. Cuccinelli as the Principal Deputy Director of USCIS.[50] The Administration did so because it believed that these steps "would allow Cuccinelli to become acting director under a provision of the [FVRA]."[51]

---

[46] Dara Lind, *Trump Pushes Out Head of Largest Immigration Agency—and Wants Ken Cuccinelli Instead*, Vox (May 25, 2019), https://perma.cc/FGX8-ZYKW (hereinafter *Trump Pushes Out Head*).

[47] *Staunch Anti-Immigration Supporter Ken Cuccinelli Named to Top Immigration Post*, CBS News (June 10, 2019), https://perma.cc/2XCM-9AQS (hereinafter *Staunch Anti-Immigration Supporter*); *see also* Jordan Fabian, *Cuccinelli Named Acting Head of Citizenship and Immigration Services*, PBS News Hour (June 10, 2019), https://perma.cc/Z26L-TRA6 (hereinafter *Cuccinelli Named Acting Head*).

[48] *Trump Pushes Out Head*, *supra* note 46.

[49] News Release: *Cuccinelli Named Acting Director of USCIS*, USCIS (June 10, 2019), https://perma.cc/QF4N-R7YN.

[50] Ted Hesson, *Cuccinelli Starts as Acting Immigration Official Despite GOP Opposition*, Politico (June 10, 2019), https://perma.cc/R3D4-2V2L.

[51] *Id*.

131.    Exercising the functions and duties of the Office of the DHS Secretary, Acting Secretary of Homeland Security Kevin McAleenan appointed Mr. Cuccinelli as Principal Deputy Director in a memorandum dated June 10, 2019. That same day, under the auspices of the Office of the DHS Secretary, Acting Secretary McAleenan issued an order amending the order of succession at USCIS to provide that the Principal Deputy Director would serve as first assistant to the Director of USCIS.

132.    Both documents stated that they would automatically terminate upon the appointment of a new USCIS Director.

133.    Congress has not, either in the Homeland Security Act or elsewhere, authorized the establishment "by Law" of the office of Principal Deputy Director of USCIS, or designated that office as the first assistant to the office of the Director.

134.    There are no publicly promulgated rules, directives, or other documents reflecting the creation of the office of Principal Deputy Director or that position's designation as first assistant to the Director.

135.    At the time, Mr. Cuccinelli had never served in USCIS, any other component of DHS, nor any other federal agency, as either an appointed official or as an employee. *L.M.-M.*, 442 F. Supp. 3d at 11.

136.    Senators from the President's own party made clear that they would not have voted to confirm Mr. Cuccinelli as USCIS Director. Senate Majority Leader Mitch McConnell expressed his "lack of enthusiasm" for Mr. Cuccinelli.[52] Senator John Thune, the Senate Majority Whip, stated that Mr. Cuccinelli "would have had a hard time getting confirmed," and

---

[52] Jordain Carney, *Republicans Warn Cuccinelli Won't Get Confirmed by GOP Senate*, The Hill (June 10, 2019), https://perma.cc/DG44-35TS.

that appointing Mr. Cuccinelli as the Acting Director was "probably the only way they could get him in there."[53] Senators Chuck Grassley, Marco Rubio, and Mitt Romney also voiced concern over the President's decision to appoint Mr. Cuccinelli.[54]

137.    President Trump and his Administration were therefore "made aware that Cuccinelli would have a difficult time winning confirmation in the Senate."[55] Indeed, it was reported at the time that "Cuccinelli stands almost no chance of being confirmed by the Senate if Trump were to nominate him to be the agency's permanent director."[56]

138.    In response to Mr. Cuccinelli's appointment, the chairs of the House of Representatives Committees on the Judiciary, Oversight and Government Reform, and Homeland Security sent a letter to Acting Secretary of Homeland Security Kevin McAleenan. The letter voiced concern that "Mr. Cuccinelli was appointed in a manner that circumvents the Federal Vacancies Reform Act" because "Mr. Cuccinelli did not meet any of th[e] criteria" for appointment under the FVRA.[57]

139.    A coalition of organizations that work to protect the rights of immigrants and/or to assist immigrants in seeking legal immigration status submitted a letter to the Attorney

---

[53] *Id.*

[54] *Id.*

[55] *Cuccinelli Named Acting Head of U.S. Citizenship and Immigration Services*, PBS News House (June 10, 2019), https://perma.cc/42H9-XTHP.

[56] Claire Hansen, *Cuccinelli's Appointment Seen as a Further Sign of Shift in Focus at USCIS*, U.S. News (June 13, 2019), (hereinafter *Cuccinelli's Appointment*), https://perma.cc/MN2L-X82L; *see also* Geneva Sands, *Ken Cuccinelli Takes Over as Acting Director of Citizenship and Immigration Services*, CNN (June 10, 2019), https://perma.cc/WCY2-SBFR ("Republican lawmakers have privately signaled to the White House should not nominate Cuccinelli [sic], or else he risks having another high-profile pick forced to withdraw, CNN has learned.").

[57] Letter from Jerrold Nadler, Chairman, House Comm. on the Judiciary, et al. to Kevin K. McAleenan, Acting Sec'y, DHS, at 1 (June 19, 2019), https://perma.cc/S4QR-A4Z2.

General and the U.S. Attorney for the District of Columbia, asking them to institute a proceeding for writ of quo warranto to remove Mr. Cuccinelli from office given the legal flaws in his appointment.[58] Two other organizations also submitted a letter to Mr. McAleenan and Mr. Cuccinelli addressing the flaws in Mr. Cuccinelli's appointment.[59]

140.    On information and belief, the Trump Administration appointed Mr. Cuccinelli as Principal Deputy Director and Acting Director of USCIS because the Senate would not have confirmed him if he had been nominated to be USCIS Director.

141.    On information and belief, the Trump Administration appointed Mr. Cuccinelli as Principal Deputy Director and Acting Director of USCIS for the unlawful purpose of circumventing the Senate's mandatory role in the appointment of the USCIS Director.

142.    Judge Moss, in this District, held that Mr. Cuccinelli could not become the Acting Director of USCIS by virtue of serving as the "first assistant" to that position, however, because the term first assistant "under any plausible construction comprehends a role that is, in some manner and at some time, subordinate to the principal." *L.M.-M.*, 442 F. Supp. 3d at 25.

143.    Because Mr. Cuccinelli's position as Principal Deputy Director was created solely to enable him to serve as Acting Director, and because that position was slated to dissolve as soon as a USCIS Director was confirmed, Mr. Cuccinelli "never did and never will serve in a subordinate role—that is, as an 'assistant'—to any other USCIS official." *Id.* at 24-25. Thus, Judge Moss concluded that Mr. Cuccinelli's tenure as the purported Acting Director of USCIS was unlawful and actions taken pursuant to that ill-gotten authority were invalid. *Id.* at 23.

---

[58] Letter from Democracy Forward et al. to William Barr, U.S. Att'y Gen., and Jessie K. Liu, U.S. Att'y, (July 22, 2019), https://perma.cc/T2LS-HCAP.

[59] Letter from Protect Democracy & Constitutional Accountability Ctr. to Kevin McAleenan, Acting Sec'y, DHS, and Kenneth T. Cuccinelli, Acting Dir., USCIS (July 30, 2019), https://perma.cc/4HL2-XABG.

Defendants initially appealed Judge Moss's decision, but on August 13, 2020, voluntarily stipulated to dismiss their appeal. *See L.M.-M. v. Cuccinelli*, No. 20-5141 (D.C. Cir. Aug. 13, 2020).

144.    In addition to the wholly sufficient reason identified by Judge Moss, Mr. Cuccinelli's service at USCIS was unlawful for another, independent reason: Mr. McAleenan himself never lawfully held the position of Acting DHS Secretary after Secretary Kirstjen Nielsen resigned. *See GAO Decision*, https://perma.cc/TU6G-YCBD. He therefore never possessed the authority to name Mr. Cuccinelli to USCIS or to amend the USCIS succession order to allow Mr. Cuccinelli to ascend to the Acting Director position.

145.    On February 15, 2019, Secretary Nielsen established a succession order for DHS pursuant to the Homeland Security Act, 6 U.S.C. § 113(g).[60] That order established two separate paths through which an official could ascend to the Acting Secretary role: Path 1 governed when the Secretary died, resigned, or was unable to perform the functions of the Office of the Secretary, and followed an order of succession established in Executive Order 13753. Path 2 governed when the Secretary was unavailable to act during a disaster or catastrophic emergency and followed an order of succession established in Annex A to HSA Delegation 00106.

146.    Under either path, however, the operative succession order for the position of Secretary would be the same: (1) Deputy Secretary, (2) Under Secretary for Management, (3) Administrator of the Federal Emergency Management Agency ("FEMA"), and (4) Director of the Cybersecurity and Infrastructure Security Agency ("CISA").[61]

---

[60] DHS, *DHS Orders of Succession and Delegations of Authorities for Named Positions*, DHS Delegation No. 00106, Revision No. 08.4 (Feb. 15, 2019).

[61] *Id.*

147.     Secretary Nielsen amended HSA Delegation 00106 just before her departure by altering the succession order contained in Annex A (the "April Delegation"). [62] In doing so, she provided that the following succession order would govern if the Secretary became unavailable due to an emergency or catastrophic event: (1) Deputy Secretary, (2) Under Secretary for Management, (3) Commissioner of CBP, and (4) Administrator of FEMA. Importantly, the April Delegation did not disturb the succession order that would govern if a Secretary died, resigned, or was unable to perform the functions and duties of the office, which would continue to follow the one set forth in Executive Order 13753. [63]

148.     Thus, when Secretary Nielsen resigned, the order of succession specified by Executive Order 13573 was triggered—meaning that Christopher Krebs, as the confirmed Director of CISA, should have ascended to the role of Acting Secretary. [64] Mr. McAleenan, who was serving as the Commissioner of CBP at the time of Secretary Nielsen's resignation, would not have been eligible to ascend to the Acting Secretary role.

149.     Nevertheless, upon the resignation of Secretary Nielsen, and relying on the succession order in Annex A to the April Delegation, Mr. McAleenan purported to step into the role of Acting Secretary. This was in error: because Secretary Nielsen resigned, and was not made unavailable due to an emergency or catastrophic event, HSA Delegation 00106—including as amended by the April Delegation—governed the succession process, and provided that CISA

---

[62] *See* DHS Delegation No. 00106 (Revision No. 08.5), *DHS Orders of Succession and Delegations of Authorities for Named Positions* (Apr. 10, 2019), available at Enclosures A & B, Letter from Bennie G. Thompson, Chairman, Comm. on Homeland Sec. & Carolyn B. Maloney, Acting Chairwoman, Comm. on Oversight and Reform to Gene Dorado, U.S. Comptroller Gen. (Nov. 15, 2019), https://perma.cc/V8HZ-JL4F.

[63] *Id.*

[64] The position of FEMA Administrator was vacant following the resignation of Administrator Brock Long in March 2019.

Director Krebs should have ascended to the role of Acting Secretary, not CBP Commissioner McAleenan.

150.   Thus, as the Government Accountability Office ("GAO") recently concluded, Mr. McAleenan did not validly succeed Secretary Nielsen and so never possessed the authority to exercise the functions and duties of the Office of DHS Secretary,[65] including by appointing acting officials and amending orders of succession, as he did to install Mr. Cuccinelli at USCIS.[66] He therefore could not confer any lawful authority upon Mr. Cuccinelli.

151.   On November 14, 2019, Acting Secretary Wolf announced that Mr. Cuccinelli would serve as "acting deputy secretary" for DHS in addition to his responsibilities at USCIS.[67] However, because Mr. Cuccinelli lacked any lawful authority to serve as Acting Deputy Secretary, he was instead appointed the "Senior Official Performing the Duties of the Deputy Secretary for the Department of Homeland Security," and he continues to serve in that capacity.[68]

152.   On December 20, when the TPS Policy Alert was issued, Mr. Cuccinelli was still purporting to serve as the Acting Director of USCIS. Notwithstanding his DHS appointment, Mr.

---

[65] *See GAO Decision*, https://perma.cc/TU6G-YCBD.

[66] By its terms, GAO's decision only addressed Mr. Cuccinelli's "service as the Senior Official Performing the Duties of Deputy Secretary and [did] not address any other positions" he holds, *id.* at 4 n.6. Nevertheless, its conclusion that Mr. McAleenan was unlawfully serving as Acting Secretary is directly relevant to the legality of his June 10, 2019 memorandum appointing Mr. Cuccinelli as Principal Deputy Director of USCIS and subsequent order amending the USCIS order of succession to provide that the Principal Deputy Director would serve as first assistant to the Director of USICS.

[67] Tanvi Misra, *Suddenly, Ken Cuccinelli Is No. 2 at DHS*, Roll Call (Nov. 14, 2019), https://perma.cc/WY7H-3F6L.

[68] *Kenneth T. (Ken) Cuccinelli, Senior Official Performing the Duties of the Director, U.S. Citizenship and Immigration Services; Director (vacant)*, USCIS (July 30, 2020), https://perma.cc/3RY2-PSTC.

Cuccinelli also continued to serve as Acting Director of USCIS until December 28, 2019, when the 210 day limit for service under the FVRA expired.[69] At that point, his title changed to "Senior Official Performing the Duties of the Director" of USCIS, which it has remained since then.[70]

153.    On February 19, 2020, USCIS split the Deputy Director position into two roles: a Deputy Director for "Policy" and a Deputy Director for "Operations."[71]

154.    As of the filing of this Complaint, President Trump has neither named a nominee for USCIS Director nor announced any intent or timetable to nominate someone.

### VIII.   Mr. Cuccinelli's Unlawful TPS Policy Alert

155.    Since taking office, Mr. Cuccinelli has stated that USCIS offers "privileges, not rights," to immigrants and that USCIS is "a vetting agency, not a benefits agency."[72] His appointment signaled "an agency-wide shift in focus from facilitating the lawful settlement of migrants to increasingly participating in the administration's crackdown on immigration."[73]

156.    Despite having no lawful authority to do so, Mr. Cuccinelli has issued multiple directives that alter aspects of the United States' immigration system, at least two of which have

---

[69] *See Federal Vacancies Reform Act*, GAO, https://www.gao.gov/legal/other-legal-work/federal-vacancies-reform-act?vacancyTitle=&vacancyActing=&vacancyNominee=&agency=Department+of+Homeland+Security&subagency=All&status=all&rpp=10&o=0&searched=1&order_by=date&Submit=Search#search (last visited July 16, 2020).

[70] *Leadership*, USCIS, (Aug. 13, 2020), https://perma.cc/2CMA-C7JC.

[71] Geneva Sands, *Latest Immigration Appointment Signals Shakeup Pushed by White House*, CNN (Feb. 19, 2020), https://perma.cc/3B5B-J5PX.

[72] Philip Wegmann, *Cuccinelli, the Immigration Hawk After Trump's Own Heart*, RealClear Pol. (July 21, 2019), https://perma.cc/E495-4CWZ (hereinafter *Cuccinelli, the Immigration Hawk*).

[73] *Cuccinelli's Appointment*, *supra* note 56.

been invalidated based on the infirmities with his appointment, *see L.M.-M.*, 442 F. Supp. 3d at 37.

157.    On December 20, 2019, while Mr. Cuccinelli was purporting to be the Acting Director, USCIS issued the TPS Policy Alert.

158.    The TPS Policy Alert informed the public that it was amending its policy manual to state that "a TPS beneficiary who obtains USCIS's authorization to travel abroad temporarily (as evidenced by an advance parole document) and who departs and returns to the United States in accordance with such authorization remains in the same exact immigration status and circumstances as when he or she left the United States."[74]

159.    Leaving no doubt about the impact of this new policy, the TPS Policy Alert makes plain that departure and return under advance parole would no longer "result in the execution of any outstanding removal order to which a TPS beneficiary may be subject,"[75] thereby depriving USCIS of jurisdiction over all adjustment applications submitted by TPS beneficiaries with removal orders, even where they had traveled abroad and lawfully returned with prior USCIS consent, *see supra* ¶ 7.

160.    The TPS Policy Alert amounts to final agency action. There is no indication on the face of the TPS Policy Alert that Defendants are continuing to deliberate on this issue. Rather, the TPS Policy Alert is clear that it "is controlling and supersedes any prior guidance on the topic."[76] Moreover, the TPS Policy Alert determines the rights and obligations of TPS beneficiaries. It commands USCIS officials to treat removal orders as unexecuted, even if the

---

[74] TPS Policy Alert at 1; *see also* USCIS, *Policy Manual*, at Vol. 7, Pt. A, Ch. 3 n.19.

[75] TPS Policy Alert at 1.

[76] *Id.*

TPS beneficiary had departed and lawfully returned with prior USCIS consent, thereby rendering them ineligible for an immigration benefit for which they were previously eligible to apply: adjustment of status to LPR through USCIS.

161.    The TPS Policy Alert conflicts with the INA because it directly contravenes plain statutory language establishing that an individual who has been "ordered deported or removed … who has left the United States, shall be considered to have been deported or removed in pursuance of law." 8 U.S.C. § 1101(g).

162.    The TPS Policy Alert was also implemented without any consideration for the problems that it would create, especially for those, like the Plaintiffs, who had come to rely on the prior USCIS policy or practice, which comported with the INA's statutory definition of when deportation or removal has occurred. Indeed, on information and belief, Defendants gave no consideration to the weighty reliance interests of such organizations and individuals. There was no consideration for what this change would mean for legal service providers, like CARECEN, or for TPS beneficiaries who have expended significant time and resources to apply or prepare to apply for adjustment of status and relied on USCIS's prior policy or practice to do so.

163.    Moreover, there is no acknowledgement in the TPS Policy Alert of the scope of the change in policy it effects, the size of the population it impacts (potentially tens of thousands of TPS beneficiaries), the limited and onerous path to becoming an LPR left for TPS beneficiaries to navigate, the possibility that some TPS beneficiaries will be denied a forum in which to apply for adjustment of status altogether, the way in which the TPS Policy Alert interacts with Defendants' other efforts to eliminate TPS, or the risk that this will cause some TPS beneficiaries to have to spend significant—or even indefinite—periods of time outside of the United States and away from their families.

164.    And, on information and belief, a substantial factor motivating its implementation was the Defendants' animus toward immigrants—particularly immigrants of color and TPS beneficiaries, *see infra* ¶¶ 171-180.

165.    The TPS Policy Alert was also enacted without any advance notice to the public, or an opportunity for the public to comment on the new policy.

166.    The TPS Policy Alert is further invalid because it constitutes a directive promulgated by Mr. Cuccinelli in his then-purported capacity as Acting Director of USCIS.

167.    The TPS Policy Alert bears letterhead reflecting that it came from the "U.S. Citizenship and Immigration Services Office of the Director."[77]

168.    The TPS Policy Alert purports to amend the USCIS Policy Manual, and thereby invokes the USCIS Director's authority to "establish" and "administ[er]" the policies underlying the nation's lawful immigration system and to "establish national immigration services policies and priorities." 6 U.S.C. § 271(a)(3)(A), (B), (D).

169.    Alternatively, and on information and belief, as the purported Acting Director of USCIS, Mr. Cuccinelli was involved in the promulgation of the TPS Policy Alert, supervised agency personnel in the preparation of the TPS Policy Alert, and/or unlawfully delegated authority to promulgate the TPS Policy Alert that he did not possess.

## IX.    The Trump Administration's Animus Towards TPS Beneficiaries

170.    Defendants' attempts to block TPS beneficiaries with removal orders from becoming eligible to adjust to LPR is also grounded in the Trump Administration's specific animus toward immigrants of color seeking protection under TPS, as well as its broader animus

---

[77] *See* TPS Policy Alert at 1.

toward immigrants, particularly immigrants of color, who are seeking protection under programs furthering the United States' humanitarian commitments.

171.    President Trump has questioned why the United States would grant immigration protection, including under TPS, for individuals from countries the President has described as "shithole countries," such as El Salvador, Haiti, and certain African nations.[78] He has further baselessly claimed that immigrants from Haiti "all have AIDS," and that Nigerians would refuse to return to their "huts in Africa" once they saw the United States.[79] By contrast, the President has suggested that the United States should instead focus on bringing people from countries like Norway, a majority white country.[80]

172.    The President's animus toward immigrants coming from Latin American countries, in particular, and seeking humanitarian forms of immigration relief, is also readily apparent. He has expressed his view that these are "[s]ome of the roughest people you have ever seen. People that look like they should be fighting for the [Ultimate Fighting Championship]."[81] He has also repeatedly referred to migrants traveling towards the United States border as "an invasion" filled with "[m]any [g]ang [m]embers and some very bad people,"[82] asserting, with no basis, that they were "not legitimate asylum seekers."[83]

---

[78] Vitali et al., *supra* note 5.

[79] *Id.*

[80] *Id.*

[81] Michelle Mark, *Trump Mocks Asylum-Seekers at the Border, Says They 'Look Like They Should Be Fighting for the UFC,'* Business Insider (Apr. 7, 2019), https://perma.cc/R633-NTRT.

[82] Donald Trump (@realDonaldTrump), Twitter (Oct. 29, 2018), https://perma.cc/8HBN-MDH8.

[83] Benjamin Siegel et al., *Trump Claims Crackdown Coming on Asylum Seekers, Says Troops Could Fire on Migrants If Rocks Thrown*, ABC News (Nov. 1, 2018), https://perma.cc/E39M-JVC3.

173.    This portrait of Latin American migrants as some kind of dangerous, gathering horde is part and parcel of his apparent (unfounded) belief that these individuals are conspiring to remain in the United States by asserting fraudulent claims for humanitarian relief.[84]

174.    Similarly, Defendant Kenneth T. Cuccinelli II has a history of expressing animus towards immigrants, particularly immigrants of color, and their families. Specifically, Mr. Cuccinelli has compared immigrants to pests, such as rats.[85]

175.    He has also argued that states should invoke "war powers" to combat an "invasion" of immigrants by "turn[ing] people back at the border," claiming states should "just point them back across the river and let them swim for it."[86]

176.    Like President Trump, Mr. Cuccinelli has expressed the unfounded view that immigrants seeking humanitarian forms of relief are lying to remain in the United States under false pretenses.[87]

177.    He has even interpreted *The New Colossus*, the poem inscribed on the base of the Statue of Liberty, to mean, "[g]ive me your tired and your poor who can stand on their own two

---

[84] *See, e.g.*, Remarks by President Trump on the Illegal Immigration Crisis and Border Security, White House (Nov. 1, 2018), https://perma.cc/4QMA-PWKB (asserting, without basis, that asylum seekers making credible fear statements are, in fact, "using well-coached language—by lawyers and others that stand there trying to get fees or whatever they can get").

[85] Nick Wing, *Ken Cuccinelli Once Compared Immigration Policy To Pest Control, Exterminating Rats*, HuffPost (July 26, 2013), https://perma.cc/MMQ3-SHT5 (Cuccinelli arguing that a District of Columbia ordinance restricting pest control "is worse than our immigration policy" because "[y]ou can't break up rat families").

[86] John Binder, *Exclusive–Ken Cuccinelli: States Can Stop Migrant Caravan 'Invasion' with Constitutional 'War Powers,'* Breitbart (Oct. 23, 2018), https://perma.cc/XN52-KEF8.

[87] *Sunday Morning Features Transcript*, Fox News (June 30, 2019), https://perma.cc/QQ69-T5AT.

feet and who will not become a public charge."[88] He later clarified that Emma Lazarus's poem, and the charitable spirit embodied therein, "was referring back to people coming from Europe."[89]

178.    These statements and actions illustrate the Trump Administration's animus toward TPS beneficiaries, nearly all of whom are not white and, by the terms of the TPS program, come from countries experiencing significant difficulties.

179.    The TPS Policy Alert focuses narrowly on immigrants from countries that the President has previously expressed his deep-seated animus towards, and, upon information and belief, the TPS Policy Alert stems from the same underlying animus.

**X.**    **Plaintiffs' Harms from the Unlawful TPS Policy Alert**

180.    Each of the Plaintiffs has suffered harm as a result of Mr. Cuccinelli's unlawful TPS Policy Alert.

181.    The TPS Policy Alert harms the Individual Plaintiffs by barring them from adjusting their status to permanent residence through USCIS.

182.    Ms. Romero, Mr. Velasco, Ms. Hernandez, Ms. Bazile, and Mr. Medina each submitted their applications for adjustment of status to Defendants prior to the TPS Policy Alert going into effect. Prior to the TPS Policy Alert, each would have been eligible to adjust their status through USCIS. On information and belief, USCIS denied the applications of Ms. Romero, Mr. Velasco, Ms. Hernandez, and Ms. Bazile pursuant to the TPS Policy Alert.

183.    Mr. Medina's application remains pending before USCIS, but the TPS Policy Alert makes it very likely that USCIS will soon deny his application as well.

---

[88] Devan Cole and Caroline Kelly, *Cuccinelli Rewrites Statue of Liberty Poem to Make Case for Limiting Immigration*, CNN (Aug. 13, 2019), https://perma.cc/CSE7-W3NZ.
[89] *Id.*

184.     Each would do all they could to have USCIS reconsider their application if the TPS Policy Alert were set aside, including, if required, re-submitting their applications.

185.     Ms. Alvarez and Ms. Ramirez have both taken predicate steps that, under USCIS's prior policy or practice, would have rendered them eligible to apply for adjustment through USCIS. Specifically, each has departed from the United States and lawfully returned under a grant of advance parole, and established their qualifying relationship to a U.S. citizen with an approved Form I-130 (Petition for Alien Relative). Ms. Alvarez and Ms. Ramirez would both take the further action of submitting their application for adjustment (Form I-485) to USCIS were the TPS Policy Alert set aside although each understand that, at present, they are blocked by the TPS Policy Alert from successfully applying to adjust their status.

186.     Thus, the TPS Policy Alert denies them the ability to apply to adjust their status to LPR through USCIS, leaving them only with the highly discretionary, complex, and potentially time and resource intensive process of seeking to reopen their respective deportation and removal orders in order to then apply for adjustment of status through EOIR. Even leaving aside the difficulty of the motion to reopen process, the mere fact that it imposes a predicate barrier to applying for adjustment illustrates the true effect of the TPS Policy Alert: effectively denying TPS beneficiaries with removal orders *any* forum at all in which to directly apply for adjustment to LPR status, blocking them from a chance to access the benefits that come with attainment of that status at a time when their protection under TPS may be nearing its end.

187.     The TPS Policy Alert also inflicts financial and other harms on the Individual Plaintiffs. The Individual Plaintiffs have paid hundreds of dollars in application fees and expended time and energy to complete necessary paperwork, some of which has already been approved by Defendants.

188.     Each of the Individual Plaintiffs has expended time and energy to prepare and submit Form I-130, and paid the associated $535 filing fee only for the purpose of applying to adjust their status through USCIS. Ms. Romero, Mr. Velasco, Ms. Hernandez, Ms. Bazile, and Mr. Medina have additionally expended time and energy to prepare and submit Form I-485, and the associated $1,225 filing fee, along with other forms and their associated fees.

189.     These substantial efforts, undertaken for the purpose of ultimately adjusting status to LPR, were rendered futile by the TPS Policy Alert.

190.     The TPS Policy Alert now forces the Individual Plaintiffs to choose between the frying pan and the fire in order to adjust their status to LPR: (1) petitioning the immigration court that long ago issued their removal or deportation orders in a costly, long-shot bid to reopen those closed proceedings—if they are even eligible to do so, or (2) returning to countries from which they once fled, potentially for a decade—separated from their U.S. citizen or LPR family members, their communities, and their livelihoods—and then attempting, after that period of time, to begin the process of applying for LPR status from outside the United States.

191.     The TPS Policy Alert also prevents the Individual Plaintiffs from obtaining a more secure status in the United States. Because USCIS has already taken final action to terminate most of the existing TPS designations, including for El Salvador and Haiti, each of the Individual Plaintiffs is protected from removal only by an injunction issued in the course of separate litigation.[90] If those injunctions are lifted, the Individual Plaintiffs will once again be exposed to the risk of immediate removal stemming from orders issued many years ago that, under prior policy or practice, would have been deemed "executed" as a consequence of their

---

[90] *See* 84 Fed. Reg. 7,103, 7,103 (March 1, 2019) (announcing that "[b]eneficiaries under the Temporary Protected Status (TPS) designations for Sudan, Nicaragua, Haiti, and El Salvador will retain their TPS while the preliminary injunction remains in effect").

respective travel. Thus, the TPS Policy Alert also puts the Individual Plaintiffs at risk of being separated from their U.S. citizen and LPR family members, their communities, and their livelihoods.

192.     Each of these harms is exacerbated every day the TPS Policy Alert remains in effect and is irreparable.

193.     The TPS Policy Alert also disrupts CARECEN's mission and operations and forces them to divert resources in several ways. CARECEN's employees have had to spend time and resources to study and understand the impact the TPS Policy Alert will have on their current and prospective clients. They have also been forced to establish new procedures for screening adjustment of status cases for TPS beneficiaries that will not be able to successfully adjust status as a consequence of the TPS Policy Alert.

194.     The TPS Policy Alert further harms CARECEN by interfering with the formation and furtherance of client relationships. Because the TPS Policy Alert effectively bars TPS beneficiaries with past removal orders from applying for adjustment of status with USCIS, CARECEN will have to turn away prospective clients who are in that position even though it was previously able to form client relationships with this population and provide legal services to them. For many of those clients, their only option will be to file a motion with EOIR to have the immigration court of original jurisdiction reopen their final removal order; a highly discretionary, complex, and potentially time and resource intensive process that CARECEN is not equipped to undertake.

195.     It will also serve fewer clients who wish to obtain travel authorization from USCIS, depart the United States, and return under a grant of advance parole, because that

straightforward path to adjustment of status for TPS beneficiaries with removal orders has been undone by the TPS Policy Alert.

196.    CARECEN offers most of these services on a low-cost basis, and so the TPS Policy Alert also imposes a direct financial cost on CARECEN because it cannot collect fees for the work the TPS Policy Alert impedes it from performing.

197.    The TPS Policy Alert imposes direct economic harm on CARECEN in another fashion, too. Because CARECEN offers its services on a fixed cost basis—meaning it charges the same rate whether a client's case takes 20 or 200 hours to complete—the TPS Policy Alert, which removes the ability of CARECEN to help its clients adjust their status efficiently and directly through USCIS, potentially commits CARECEN to expending more time and resources to determine whether a path that CARECEN can undertake exists for clients for whom adjusting status with USCIS is no longer possible because of the TPS Policy Alert and whether CARECEN will be able to continue advising or will need to refer the case out to other counsel and/or end their representation.

198.    This disruption to CARECEN's mission and practice will continue so long as the TPS Policy Alert remains operative.

## CLAIMS FOR RELIEF

### Count One
**(Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), the Immigration and Nationality Act, 8 U.S.C. § 1101(g), and its implementing regulations, 8 C.F.R. § 1241.7)**

199.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

200.    Under the Administrative Procedure Act, the court shall "hold unlawful and set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

201.    The INA mandates that when a TPS beneficiary with an outstanding removal order "le[aves] the United States" and returns, they "shall be considered to have been … removed," such that their previously outstanding removal order is extinguished. *See* 8 U.S.C. § 1101(g).

202.    In contrast, the TPS Policy Alert specifies that a TPS beneficiary's departure and return to the United States with USCIS's prior authorization will "not result in the execution of any outstanding removal order to which a TPS beneficiary may be subject," TPS Policy Alert at 1. It is therefore contrary to the INA.

203.    Because the TPS Policy Change is contrary to the requirements of 8 U.S.C. § 1101(g), it must be set aside as contrary to law. *See* 5 U.S.C. § 706(2)(A).

**Count Two**
**(Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A))**

204.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

205.    Under the Administrative Procedure Act, the court shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

206.    In promulgating the TPS Policy Alert, Defendants "failed to consider an important aspect of the problem, offered an explanation for [their] decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

207.    Defendants also failed to acknowledge that they were reversing a prior policy or practice, provided no reasoned explanation for the policy change, and failed to account for vital

49

reliance interests that the policy change disrupts. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

208.    Further, because Defendants' animus toward immigrants—particularly immigrants of color and TPS beneficiaries—motivated their decision to enact the TPS Policy Alert, their decision to do so "relied on factors which Congress has not intended [them] to consider." *State Farm*, 463 U.S. at 43.

209.    Thus, the TPS Policy Alert is arbitrary and capricious and an abuse of discretion, and must be held unlawful and set aside.

### Count Three
### (Violation of the Administrative Procedure Act, 5 U.S.C. §§ 553, 706(2)(D))

210.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

211.    Under the Administrative Procedure Act, the court shall "hold unlawful and set aside agency action" that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

212.    Specifically, the APA provides that "[g]eneral notice of proposed rule making shall be published in the Federal Register," that agencies must "give interested persons an opportunity to participate in the rule making," and that substantive rules be published 30 days before their effective date. *Id.* § 553(b), (c), (d).

213.    Because the TPS Policy Alert carries legal force and imposes obligations on members of the public, it is a legislative rule and Defendants were obligated to provide the public with a pre-promulgation opportunity for notice and comment. *See Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1110-12 (D.C. Cir. 1993).

214.    Defendants did not provide notice, an opportunity for comment, or advance publication before promulgating the TPS Policy Alert. It is therefore unlawful and must be set aside.

**Count Four**
**(Violation of the Federal Vacancies Reform Act, 5 U.S.C. § 3345 *et seq.*, Homeland Security Act, 6 U.S.C. § 113, and the Administrative Procedure Act, 5 U.S.C. § 706(2)(A, C, D))**

215.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

216.    Mr. Cuccinelli's service as Acting Director was unlawful under the Federal Vacancies Reform Act. Mr. Cuccinelli did not satisfy the statute's requirements: he never served as a first assistant within the meaning of the statute, he was not serving as the first assistant to the office of the Director when the President terminated Mr. Cissna, and he had not been serving in an office which was constituted as the first assistant to the office of the Director when the President terminated Mr. Cissna. *Id.* § 3345(a)(1). Nor had Mr. Cuccinelli "serve[d] in an office for which appointment is required to be made by the President, by and with the advice and consent of the Senate" or "in a position in [the] agency for not less than 90 days" at the GS-15 rate of pay. *Id.* § 3345(a)(2), (3).

217.    Moreover, the previous Senate-confirmed Director, Mr. Cissna, was forced to resign by President Trump. Mr. Cissna was therefore effectively fired, and did not "resign" in the manner contemplated by the FVRA. 5 U.S.C. § 3345. Accordingly, the FVRA provided no authority for Mr. Cuccinelli to serve as Acting USCIS Director, even assuming he met the statutory requirements.

218.    There is also no statute or rule, directive, or other agency action published in the Federal Register that either establishes the office of "Principal Deputy Director" or designates

the Principal Deputy Director as the first assistant to the office of the Director. The Principal Deputy Director therefore cannot serve as first assistant to the office of the USCIS Director.

219.    Further, and independently, neither Mr. Cuccinelli's appointment as Principal Deputy Director nor that position's designation as first assistant were lawful for an additional reason. Both Mr. Cuccinelli's appointment and the amendment of the USCIS succession order were executed by the then-purported Acting Secretary of DHS, Kevin McAleenan, as an exercise of the functions and duties of the Office of the DHS Secretary. But because Mr. McAleenan's appointment to the role of Acting Secretary was itself defective under the Homeland Security Act and the HSA Order of Succession in place when he assumed the Acting Secretary title, he had no authority to act in that role and so the instruments by which Mr. McAleenan installed Mr. Cuccinelli at USCIS were likewise invalid and had no force or effect. Thus, Mr. Cuccinelli's service at USCIS, and his exercise of authority as either the Acting Director or the Principal Deputy Director of USCIS, were invalid by extension.

220.    Mr. Cuccinelli, through the office he was then purporting to hold, promulgated the TPS Policy Alert pursuant to the USCIS Director's non-delegable authority to establish policies for the United States' lawful immigration system. The TPS Policy Alert therefore "shall have no force or effect." 5 U.S.C. § 3348(d)(1).

221.    Thus, the TPS Policy Alert was enacted "not in accordance with law," 5 U.S.C. § 706(2)(A), by an official acting "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C), and "without observance of procedure required by law," *id.* § 706(2)(D). It is therefore unlawful and should be set aside.

**Count Five**
**(Violation of the Appointments Clause of the U.S. Constitution,**
**U.S. Const. art. II, § 2, cl. 2)**

222.   Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

223.   The Appointments Clause of the U.S. Constitution provides that officers of the United States may be appointed by the President "by and with the Advice and Consent of the Senate," unless Congress has "by Law" authorized the appointment of an inferior officer by the President, the courts, or a department head. U.S. Const. art. II, § 2, cl. 2. The Appointments Clause also provides that Congress has exclusive authority to "establish[]" offices "by Law." U.S. Const. art. II, § 2, cl. 2.

224.   As Acting USCIS Director and as the Principal Deputy Director performing the functions and duties of the USCIS Director, Mr. Cuccinelli exercised significant authority and discretion, and therefore was serving as an officer for the purposes of the Appointments Clause at the time he enacted the TPS Policy Alert. *See, e.g.*, *Lucia*, 138 S. Ct. at 2051-52.

225.   Although he was serving as an officer, Mr. Cuccinelli had not been nominated by the President and confirmed by the Senate. Nor had Congress enacted a law authorizing Mr. Cuccinelli to perform the functions and duties of USCIS Director without Senate confirmation or authorizing the creation of the office of Principal Deputy Director.

226.   Plaintiffs filed suit to challenge the TPS Policy Alert within a reasonable amount of time after it was promulgated, and Defendants had reasonable notice of the defect in Mr. Cuccinelli's appointment. *See Andrade v. Lauer*, 729 F.2d 1475, 1500 (D.C. Cir. 1984). Thus, the TPS Policy Alert is unlawful and must be invalidated.

## Count Six
### (*Ultra Vires* Action)

227.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

228.    Courts have equitable authority to enjoin *ultra vires* agency action. *See, e.g.*, *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

229.    Because Mr. Cuccinelli's service was not authorized by DHS's own succession order, HSA Delegation 00106, the Federal Vacancies Reform Act, or the Appointments Clause of the U.S. Constitution, any actions he or USCIS took in reliance on that status, including establishing and implementing the TPS Policy Alert, are *ultra vires* and unlawful.

## Count Seven
### (Violation of the Fifth Amendment – Equal Protection, U.S. Const., amend. V)

230.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

231.    The Due Process Clause of the Fifth Amendment prohibits Defendants from denying any person the equal protection of the laws, including on the basis of race, national origin, nationality, income, or receipt of public benefits.

232.    The TPS Policy Alert discriminates on the basis of race, national origin, and nationality, and was motivated by animus and a desire to affect such discrimination. Moreover, the TPS Policy Alert was motivated by discriminatory and baseless stereotypes concerning the suitability of immigrants, particularly immigrants from Latin American and African countries, to reside and maintain status in the United States.

233.    Defendants' statements provide direct evidence of their discriminatory motives in enacting the TPS Policy Alert. Courts have found similar statements and actions to state a plausible claim that the Administration's policies stem from unlawful animus, including

54

specifically in the context of TPS beneficiaries. *See Saget v. Trump*, 345 F. Supp. 3d 287, 303 (E.D.N.Y. 2018); *NAACP v. DHS*, 364 F. Supp. 3d 568, 578 (D. Md. 2019); *Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1108 (N.D. Cal. 2018) (granting preliminary injunction), *appeal filed*, No. 18-16981 (9th Cir. 2018); *see also Make the Rd. New York v. Pompeo*, 19-cv-11633 (GBD), 2020 WL 4350731, at *18-19 (S.D.N.Y. July 29, 2020).

234.     The TPS Policy Alert is not narrowly tailored to any legitimate governmental purpose, nor does it further a substantial governmental interest when it is weighed against the harm it imposes to the TPS beneficiaries, including to their families and communities, or to the legal advocates who represent TPS beneficiaries. The TPS Policy Alert also is not rationally related to any legitimate governmental interest.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

1.     declare the TPS Policy Alert unlawful, and that Mr. Cuccinelli's appointment as Acting USCIS Director was unlawful;

2.     vacate and set aside the TPS Policy Alert;

3.     enjoin Defendants from processing and adjudicating applications under the TPS Policy Alert and to re-process any applications unlawfully denied on the basis of the TPS Policy Alert;

4.     award Plaintiffs their costs, attorneys' fees, and other disbursements for this action; and

5.     grant any other relief this Court deems appropriate.

Dated: August 26, 2020                              Respectfully submitted,

James B. Amler*                                      */s/ Benjamin Seel*
Tara P. Ganapathy (D.C. Bar No. 1659437)             Benjamin Seel (D.C. Bar No. 1035286)

DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
jbamler@debevoise.com
tganapathy@debevoise.com

Julie A. Soininen (D.C. Bar No. 448700)
Concepción De Montagut
(D.C. Bar No. 432076)
Germaine W. Sobral (D.C. Bar No. 361476)
Christian Sotomayor (D.C. Bar No. 1617828)
MONTAGUT & SOBRAL, PC
5693 Columbia Pike, #201
Falls Church, VA 22041
jsoininen@mslaw.pro
cmontagut@mslaw.pro
gsobral@mslaw.pro
csotomayor@mslaw.pro

John T. Lewis (D.C. Bar No. 1033826)
Sean A. Lev (D.C. Bar No. 449936)
DEMOCRACY FORWARD FOUNDATION
1333 H Street NW
Washington, DC 20005
(202) 448-9090
bseel@democracyforward.org
jlewis@democracyforward.org
slev@democracyforward.org

Michelle Mendez*
Bradley Jenkins (D.D.C. Bar ID: MD0110)
Rebecca Scholtz
CATHOLIC LEGAL IMMIGRATION
NETWORK, INC.
8757 Georgia Ave., Suite 850
Silver Spring, MD 20910
(301)565-4820
mmendez@cliniclegal.org
bjenkins@cliniclegal.org
rscholtz@cliniclegal.org

*Counsel for Plaintiffs*

*\*Application for admission pro hac vice*
*forthcoming*